UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

Case No. _____

IVY REED and PAUL REED,

      Plaintiffs

v.

ROYAL CARIBBEAN CRUISES,
LTD. d/b/a ROYAL CARIBBEAN
INTERNATIONAL,

      Defendants

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

**IVY REED and PAUL REED ("Plaintiffs")**, by and through their undersigned counsel, hereby file this Complaint and allege the following:

**PARTIES**

1.  Plaintiff IVY REED is a resident of the State of Maryland.

2.  Plaintiff PAUL REED is a resident of the State of Maryland.  He is also known as Rick Reed. (hereafter Ivy Reed and Paul Reed collectively either "Plaintiffs" or the "Reeds").

3.  Plaintiffs are husband and wife and were such prior to December 9, 2019.

4.  Defendant ROYAL CARIBBEAN CRUISES LTD. ("Royal Caribbean") is a corporation organized under the laws of the Republic of Liberia with its principal place of business in Florida.  Its address is 1050 Caribbean Way, Miami, Florida 33130.

5.  ROYAL CARIBBEAN INTERNATIONAL ("RCI") is a registered fictitious name wholly

owned by Royal Caribbean and under which Royal Caribbean does business as with its principal place of business located at 1050 Caribbean Way, Miami, Florida 33130.  RCI is the fictitious name under which Royal Caribbean operates numerous cruise vessels in its fleet.

6.  Collectively the Defendants are hereinafter referred to as "RCCL."

## JURISDICTION AND VENUE

7.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the Parties are from different states and the matter in controversy exceeds the sum of $75,000.

8.  This Court also has jurisdiction over this action pursuant to the admiralty jurisdiction of 28 U.S.C. § 1333.

9.  At all times material to this Complaint, RCCL, personally or through an agent:  (a) Operated, conducted, engaged in or carried on a business venture in this state and/or county or had an office or agency in this state and/or county; (b) was engaged in substantial activity within this state; (c) operated vessels in the waters of the State of Florida; (d) Committed one or more of the acts stated in Florida Statutes §§ 48.081, 48.181 and/or 48.193; (e)  The acts of RCCL set out in this Complaint occurred in whole or in part in this county and/or state; (f) RCCL was engaged in the business of providing to the public and to the Plaintiffs in particular, for compensation, vacation cruises aboard their vessels.

10. RCCL is subject to the jurisdiction of the courts of the State of Florida.

11. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b).

- 2 -

**BACKGROUND AND FACTS OF THE CASE**

12. In this Complaint, the Reeds seek compensation in connection with permanent, disfiguring and disabling injuries sustained by the Reeds due to an explosive volcanic eruption that occurred during a shore excursion marketed, sold and facilitated by RCCL and for which RCCL was compensated.  Plaintiffs suffered these injuries during a December 9, 2019 excursion to White Island (also known by its native name, Whakaari) off the coast of New Zealand organized by RCCL for passengers on its ship, Ovation of the Seas (the "Ship").  The Ship is registered to RCI.

13. The shore excursion to White Island – which is essentially the top of an active volcano -- occurred during a stopover by the Ship at the port of Tauranga, New Zealand.

14. RCCL and its tour operator were aware of a 2016 volcanic eruption at White Island that spewed ash and debris over the very same hiking trails used by cruise passengers during shore excursions.

15. In a report on the 2016 eruption, New Zealand's earthquake and geological hazard information organization, GeoNet, [1] noted that it had found "hundreds of ballistics per square meter," that is lava and rocks thrown out by the volcano, "around the tourist track at Whakaari."

16. Moreover, just a few weeks prior to the Reeds' tragic accident, on November 18,

---

[1] According to the GeoNet website, it is a partnership between the New Zealand Earthquake Commission (EQC), GNS Science, and Land Information New Zealand (LINZ). The GeoNet project was established in 2001 to build and operate a modern geological hazard monitoring system in New Zealand.  https://www.geonet.org.nz/about. GNS Science is New Zealand's principal geological institute.

2019, New Zealand's earthquake and geological threat organization, GeoNet, had raised the Volcanic Alert Level for White Island to Level 2, indicating that "unrest hazards on the volcano…could include eruptions of steam, gas, mud and rocks.  These eruptions can occur with little or no warning."

17. RCCL had actual and constructive notice of the fact that GeoNet had raised the Volcanic Alert Level for White Island to Level 2.  Yet RCCL did nothing to warn the Reeds or its other passengers on the Ship of the elevated danger.  Despite the 2016 eruption and GeoNet's issuance of a Level 2 Volcanic Alert Level Bulletin on November 18, 2019, RCCL did nothing to warn the Reeds or its other passengers – who trusted in and relied on RCCL for their safety – of the elevated threat of a catastrophic volcanic eruption at White Island.

18.  RCCL also had actual and constructive notice of the potential dangers of volcano excursions beyond White Island.  After the May 3, 2018 eruption of Mt. Kilauea on the island of Hawaii, RCCL canceled stops on the island of Hawaii and further excursions to the volcano.

19. Unfortunately, the worst happened on December 9, 2019 and a volcanic eruption occurred during the Reeds' shore excursion to White Island, with tragic consequences:  the deaths of 22 people and grievous, permanent injuries to 25 people, including Mr. and Ms. Reed.

**The Incident**

20. RCCL promoted and marketed the visit to White Island on its website as the "adventure of a lifetime;" an "unforgettable" opportunity to see one of New Zealand's "epic" adventures.  According to RCCL's materials, the excursion would provide the opportunity to

- 4 -

witness "roaring steam vents, bubbling pits of mud, hot volcanic streams and the amazing lake of steaming acid."  RCCL handled payment arrangements, promoted and branded the excursion on brochures and vouchers as an RCCL activity for the Ship's passengers, and organized transportation for the Ship's passengers to White Island.  The voucher for the White Island shore excursion did not identify White Island Tours as the tour operator but did prominently contain RCCL graphics and logos.

21. Prior to the arrival of the Ship at Tauranga, GeoNet had raised the Volcanic Alert Level[2] for White Island from Level 1 -- "minor volcanic unrest" -- to Level 2 -- "heightened volcanic unrest" – a fact that RCCL, which maintained an office in New Zealand, knew or should have known.  RCCL had established an office in Auckland, New Zealand in 2010, which was intended to support RCCL's operational efforts in New Zealand for its cruise lines, including RCI.  GeoNet widely disseminated the Volcanic Alert Level 2 information in the tourist industry in New Zealand and had specifically conveyed this information to RCCL's White Island excursion operator.

22. Further, upon information and belief, after one passenger on the Ship became aware of the elevation of the Volcanic Alert Level to Level 2 and requested to back out of the White Island shore excursion, an RCCL staffer acknowledged that the warning level had been raised to Level 2, evidencing that RCCL and its personnel had actual knowledge of the elevated Volcanic Alert Level.

---

[2] GeoNet rates hazards on a level of 0-5, where Level 2 signifies: "Moderate to heightened volcanic unrest" where there is "potential for eruption hazards." https://www.geonet.org.nz/about/volcano/val

23. The White Island volcano erupted during the December 9, 2019 RCCL shore excursion attended by the Reeds and other passengers from the Ship.  At no time prior to that volcanic eruption had RCCL advised the Reeds or its other passengers that the New Zealand authorities had raised the Volcanic Threat Level for White Island to Level 2.

24. The December 9, 2019 White Island excursion, the volcanic eruption and the resultant injuries shall be referred to herein as the "Incident".  The eruption and resulting emissions of volcanic gas, rock and ash heated to between 200º and 390º Celsius caused the Reeds immediate fear for their lives, severe, life threatening burns over large portions of their bodies, permanent and disfiguring scarring, reduced use of their limbs and extremities, immediate, ongoing, and future needs for medical and psychological treatment, ongoing pain and suffering, rumination by Ms. Reed on a daily basis about the events surrounding the Incident, occasional terrifying flashbacks for Ms. Reed to the Incident, and emotional distress.

25. On December 11, 2019, two days after the Incident – and two days too late for the Reeds and the other unfortunate victims of the White Island eruption – RCCL informed all its cruise passengers that future shore excursions to all active volcanoes had been canceled.[3]

**Background to the Incident**

26. On February 23, 2019, the Reeds purchased their passage on the Ship for a roundtrip cruise from and returning to Sydney, Australia to commence on December 4, 2019.

---

[3]   https://www.royalcaribbeanblog.com/2019/12/11/royal-caribbean-cancels-all-shore-excursions-visiting-volcanoes

The Ship's itinerary was to sail from Sydney, Australia to New Zealand, and continue for 12 nights until returning to Sydney.

27. On May 28, 2019, the Reeds purchased tickets from RCCL for several shore excursions during the cruise of the Ship, including an excursion at the Tauranga port described as a "Journey to sunny Whakatane for a scenic boat ride along the picturesque Bay of Plenty to White Island for an unforgettable guided tour of New Zealand's most active volcano."

28. The Reeds purchased the White Island shore excursion, and other excursions, directly through RCCL.  They did so because they received a better price and a guarantee of being able to return in time to board the Ship without fear of its departing, in the event of the excursion running late.  RCCL marketed the discounts available to cruise passengers that booked excursions directly through RCCL and in advance.  RCCL recommended to the Reeds to not engage in excursions, tours or activities other than those sold through RCCL. RCCL benefited financially from the direct sale to passengers of the shore excursions, including the White Island shore excursion purchased by the Reeds, and created incentives for passengers including the Reeds to book the White Island excursion directly through RCCL.

29. The original reservation made by the Reeds provided for them to be ready at 8:30 AM to begin the excursion.  Subsequent to the Reeds' purchase of the White Island excursion from RCCL, RCCL directly informed the Reeds of a change in departure time for the White Island excursion, apparently because of a change in the arrival time for the Ship at Tauranga.  RCCL handled this change directly, by email to the Reeds dated June 27,

2019.

30. To the Reeds' knowledge, RCCL was the provider of the White Island excursion. The Reeds never had any direct contact with the tour operator for White Island prior to December 9, 2019.  The actual tour operator was not even identified in any of the marketing or billing materials provided by RCCL to the Reeds regarding the White Island excursion. The vouchers provided to the Reeds for the tragic excursion did not mention the identity of the tour operator but did prominently feature RCCL graphics and logos.

31. RCCL advertises on its website the excursions such as the White Island excursion. RCCL represents that it has chosen the providers and characterizes them as "our excursions."

32. Excursion tour operators that wish to have RCCL promote and sell their tours to cruise passengers are subject to a "request for approval" process.

33. Further, the RCCL website described shore excursions and/or excursion operators in proprietary language, in which RCCL referred to them as "its tour operators" and marketed them as "our Destination Insiders".

34. In promotional material on its website, RCCL classifies shore excursions and/or excursion operators as having been "Certified for Quality."  RCCL represents that it "thoroughly reviewed its tour operators," including each excursion's "guide" that "provides proper equipment and ensures the safety of gear used on excursions."

35. RCCL represents its shore excursions and/or excursion operators as "reputable and insured."

- 8 -

**The Incident and Initial Medical Treatment**

36. The Ship departed Sydney, Australia, with the Reeds aboard on December 4, 2019. After departure from Sydney on December 4, 2019, the Ship took several days to sail to New Zealand and then made stops at various ports there.  The Ship arrived at Tauranga, New Zealand on the morning of December 9, 2019.

37. Prior the Ship's arrival at Tauranga, RCCL continued to market the White Island excursion to the Ship's passengers.

38. Only six days before the tour, in a Volcanic Alert Bulletin issued on December 3, 2019, GeoNet's Duty Volcanologist noted that "Moderate volcanic unrest continues at Whakaari/White Island, with substantial gas, steam and mud bursts observed…the Volcanic Alert Level stays at Level 2."  The Bulletin noted volcanic activity "regularly throwing mud and debris 20-30 meters into the air above the vent" of the White Island volcano.  The Bulletin provided that "Observations and data to date suggest that the volcano may be entering a period where eruptive activity is more likely than normal."  RCCL and its tour operator had actual and constructive notice of the heightened alert level, as well as the April 2016 eruption that had buried the hiking paths in ash and volcanic debris but did nothing to warn of the dangers or in any way communicate this information to the Reeds and other passengers on the White Island shore excursion.[4]  The Reeds had no knowledge of the 2016 White Island eruption or the elevated Volcanic Alert Level for White Island.

---

[4] GeoNet's report of the April 2016 explosion noted that they had found "hundreds of ballistics per square meter" -- lava and rocks thrown out by the volcano -- "around the tourist track at [White Island]," which prompted serious discussion in the scientific community about whether tourists should be allowed on the island at all.

39. On the morning of December 9, 2019, the Reeds reported in a timely manner at 10:15 AM onboard the Ship to the Royal Theatre Deck 4 Forward, the location specified by RCCL for passengers who had signed up for the White Island excursion to report in their RCCL-branded excursion voucher.  The Reeds checked in with RCCL personnel organizing the shore excursions and then proceeded to the location for boarding bus transportation to the excursion site, which transportation had been organized by RCCL.  There was no indication in the excursion voucher as to the identity of the tour operator.

40. The front side of the excursion voucher advised that the passengers should wear walking shoes but specified nothing else regarding specialized clothing or safety equipment that might be needed to hike near the crater of an active volcano.  There was no warning as to any potential hazards from the activity of visiting an active volcano, the 2016 eruption, the elevated Volcanic Threat Level, or injuries that might be suffered.  There was no warning whatsoever written on the voucher; just a statement that guests in wheelchairs and others with limited mobility should not select the volcano tour as a shore excursion.  There was no indication whatsoever on the voucher of the identity of the tour operator.  However, the voucher did prominently display RCCL graphics and logos.  RCCL's website page promoting the White Island excursion, since taken down, did not include any warning about potential hazards of the White Island shore excursion.

41. The Reeds disembarked the Ship at the direction of crew members of the Ship and proceeded to the bus transportation to Whakatane arranged by RCCL.  After an approximately 45- to 60-minute bus ride, the Reeds and fellow passengers from the Ship arrived at Whakatane and the dock of White Island Tours.

- 10 -

42. Once the Reeds arrived at the dock in Whakatane, they and their fellow passengers from the Ship were immediately put aboard a White Island Tours company vessel, the "Te Puia Whakaari." This was the first indication to the Reeds that the shore excursion would be led by a tour operator, White Island Tours. To the best of the Reeds' recollection, all the passengers aboard the Te Puia Whakaari on the date of the Incident were from the Ship. Except as noted below regarding plastic helmets and air filters, at no time before the vessel reached White Island were the Reeds warned by RCCL, the tour operator, or anyone else of the elevated Volcanic Alert Level, provided any demonstration in use of safety equipment while on White Island, given written safety information, or presented with any written disclosure of the risks of the excursion or any other documentation, either by RCCL or White Island Tours. Although a refuge had been created on White Island and designated as a shelter of last resort in the event of an eruption, no one from RCCL White Island Tours advised the Reeds of the existence of such a shelter. Further, neither RCCL nor White Island Tours ever advised the Reeds about any rescue plan in the event of an eruption.

43. After a trip lasting around 1 hour and 15 minutes from the dock at Whakatane, the Te Puia Whakaari arrived at White Island at approximately 1:00 PM. Prior to disembarking the vessel, the Reeds and their fellow passengers were provided with yellow, plastic helmets and instructed by the White Island Tour guides to wear them at all times while on the island, as well as an air filter, which the guides advised several times was for visitors' comfort if bothered by the sulfurous smell. This was the only "safety" information that was conveyed to the Reeds and their fellow passengers on the Te Puia Whakaari. The excursion passengers, including the Reeds, were transferred first to an inflatable, Zodiac dinghy to

- 11 -

reach the jetty consisting of some ladders to climb onto the rock (visitors donned life jackets for the transfer, which they returned to White Island Tours once on the island). There was no pier or dock that had been constructed to disembark from the dinghy.

44. When the Te Puia Whakaari arrived at White Island with the Reeds aboard, there was already another White Island Tours group touring the volcano. This group had traveled to White Island on another White Island Tours vessel, the Phoenix. During this group's tour of the island, a guest recorded a voice, thought to be one of the guides for the Phoenix group, expressing concern regarding the color of the water near the crater. "We've had a change in color overnight there … I'm a little bit worried about why it's going green." No such concern or information was ever communicated to the Reeds.

45. Once all passengers in the Reeds' group had disembarked the Te Puia Whakaari, transferred to the dinghy and then assembled on White Island, the tour guides divided the passengers into two groups, each of approximately 20 people. The Reeds were in the first group, which began to proceed up the path to the volcano's edge at approximately 1:30 PM. Approximately 15 minutes later, the group including the Reeds reached the vantage point closest to the volcano's corona, which provided an opportunity for photographs.



Figure 1 -- Rick and Ivy Reed -- Photo taken by tour
guide Kelsey Waghorn shortly before eruption

A few minutes later, the Reeds' group began to descend from the corona to see the acid streams on the island, the next stop on the tour. On the way back down the path, the Reeds' group passed the second passenger group from the Te Puia Whakaari.

46. At approximately 2:10 PM, there was a tremendous explosion. The Reeds' tour guide yelled for them to "Run!"[5]  Within seconds, the Reeds' group was engulfed by a boiling cloud of acid gas, rock and ash. Although the group was able to take some shelter behind a rock formation, this did not prevent them from being injured by the steam and the super-heated rock and ash hitting them at high velocity.

_____

[5] Paul Reed recalls a more specific warning to "run and take cover."

47. At this point, in addition to the shock of the explosive eruption and the pain from the burning ash, gas and rock, Ms. Reed was additionally traumatized when she cried out to see if her husband was still alive, did not hear any response, and feared that he had been killed in the eruption.  It was pitch black as a result of the eruption and the Reeds were completely blinded by the cloud of ash and steam.  Ms. Reed felt she was being buried alive by an avalanche of burning volcanic ash, rocks and toxic gas.  Ms. Reed lost her plastic helmet in the explosive force of the eruption and began to be concerned not only for her husband's life but also for her own.

48. Meanwhile, the cloud of toxic gas and burning ash also buried Mr. Reed.  He endured such difficulty breathing and such severe pain from the burning rock and ash that he hoped to lose consciousness to halt the pain, and even wished he might die to make it stop.

49. Suddenly, there was great stillness.  The Reeds and the remainder of their group began to stagger back towards the jetty, unable to see because of the hot ash that enveloped them.  In addition, as they struggled to move towards the dock area, the Reeds were enduring searing pain from horrible burns that had been caused by the superheated rock and ash that the erupting volcano had emitted.

50. Mr. Reed was unable to see at all because his corrective eyewear was covered in ash.  Moreover, he felt a continuing, searing pain on his legs and arms, which had been completely exposed to the effects of the volcanic blast.  Although Ms. Reed was able to see after she removed her sunglasses (she was wearing contact lenses)[6], she was critically

---

[6] These later proved problematic and Ms. Reed was unable to see during her hospital stay in Auckland.  While in hospital, Ms. Reed needed to have somebody find and remove

burned on her hands and face. Nevertheless, she still had to struggle while in great pain in assisting Mr. Reed back to the White Island dock. Other passengers in their group similarly struggled to return to the shoreline and the dock.

51. Ms. Reed recalls that her group resembled people walking away from the fallen Twin Towers of the World Trade Center in New York City on September 11, 2001, except that the persons on White Island that day were horribly burned, in addition to being covered by white ash.

52. The Phoenix, which had begun its return trip to Whakatane with the immediately preceding group of visitors when the eruption occurred, had returned to pick up survivors. As the Te Puia Whakaari vessel had been damaged by the volcanic eruption, once the Reeds reached the shoreline, they were aided in climbing onto a dinghy to be transferred to the Phoenix.

53. Both the Reeds struggled to get aboard the dinghy because of the extremely severe burns to their hands, which caused them great difficulty in gripping the dinghy. At one point, when someone attempted to assist Ms. Reed in getting aboard the dinghy by reaching out to grab her hand, the skin peeled off her hand and she slipped out of his grasp.

54. The Reeds were in such serious condition and so disoriented by the effects of the volcanic blast that for some time after finally getting aboard the Phoenix, they were not

---

her contact lenses, as she was unable to do so herself because of the burns to her hands. Although her brother had brought her a pair of eyeglasses to allow her to see, Ms. Reed was unable to wear them because of the skin grafts to her nose, which required several surgeries.

aware of where they were or how the vessel had come to take them from the Island. After what the Reeds recall was an interminable delay, the Phoenix finally resumed its return to Whakatane. The trip to Whakatane took more than one hour, during which time the Reeds suffered horribly from the pain of the burns that covered their bodies, as well as from fear that their condition would worsen during the voyage back to Whakatane.

55. To the Reeds' knowledge, there was little if any first aid equipment to treat burns aboard the Phoenix. There appeared to be no medical or first aid trained personnel in the Phoenix crew, although the Reeds' fellow passengers attempted to keep them and other burn victims conscious and talking and tried to alleviate their searing pain by pouring water on their burned skin. The Reeds and other victims suffered alternately from the cold of the wind on the deck of the Phoenix, and then the burning heat from their volcanic burns once they moved inside the cabin. The Reeds describe the sensation as feeling like they were burning and freezing at the same time. Meanwhile, the Reeds were surrounded by fellow victims of the eruption, who were screaming and moaning due to the pain of their injuries.

56. Once the Phoenix arrived in Whakatane, the Reeds and their fellow victims were met by local emergency personnel. Unfortunately, due to the large number of victims, by the time that the Phoenix arrived and emergency personnel had assisted the Reeds to disembark, there were no more ambulances available. The Reeds were forced to wait as much as several hours after arriving at Whakatane, including time spent sitting in a police cruiser, before finally being taken to the hospital.

57. Finally after a delay of several hours and while continuing to endure the extraordinary pain from their burns, the Reeds were placed in ambulances. They were taken first to the

Whakatane heliport for further assessment of their condition by medical personnel and then ultimately evacuated to Tauranga Hospital, an approximately one-hour ambulance ride from the Whakatane heliport[7]. By this time, Ms. Reed's left ring finger had swelled to such a size that her wedding ring and engagement band needed to be cut off during the ambulance transfer to prevent them from causing even more extensive damage to her hand than she had already suffered from the volcanic burns. Ms. Reed's physicians have since advised that there is substantial doubt about whether she will ever be able to wear a wedding band or engagement ring again, due to the damage to the fingers of her left hand.

58. At approximately 7:30 P.M. on December 9, 2019, more than five hours after the eruption, the Reeds were finally admitted to the Intensive Care Unit ("ICU") at Tauranga Hospital. The Reeds remained hospitalized for two nights in the ICU at Tauranga Hospital.

59. On December 11, 2019, Plaintiffs were transferred to Middlemore Hospital in Auckland, during which transfer they endured an approximately three-hour ambulance journey from Tauranga Hospital. Mr. Reed was admitted to the Middlemore Intensive Care Unit ("ICU") for three nights after his arrival in Auckland. Ms. Reed was immediately admitted to Middlemore's National Burns Centre ("NBC"). Mr. Reed was released from the ICU and joined Ms. Reed in the NBC on December 15, 2019. The Reeds remained as patients at the NBC until their discharge on January 30, 2020.

60. The NBC doctors determined that Ms. Reed had suffered burns to approximately 9%

---

[7] Although their New Zealand medical records discharging them to travel to the United States on January 30, 2020 indicate that they were first taken to Whakatane Hospital, neither Ms. Reed nor Mr. Reed has any recollection of going there first. They recall going directly from the heliport medical assessment to Tauranga Hospital.

of her total body surface area, including severe chemical burns from hydrofluoric acid and thermal burns caused by super-heated volcanic ash.  The doctors also detected some abnormalities in liver function tests and noted that Ms. Reed was suffering some abdominal pain, a condition which is still being evaluated by Ms. Reed's physicians.

61. The NBC doctors determined that Mr. Reed had suffered burns to approximately 29% of his total body surface area, with hydrofluoric acid burn injury secondary to volcanic ash exposure.[8]

62. During their hospitalization at the NBC, the Reeds endured excruciatingly painful scrub down of their burns, scraping of skin, and numerous skin grafts.  Mr. and Mrs. Reed initially required significant sedation and pain medication to endure these procedures.  Ms. Reed, who is left-hand dominant, required skin grafts on her face, neck, both of her hands, and her right upper and lower leg.  Ms. Reed, who as can be seen in Figure 1 had a head of long hair, had to endure the pain and humiliation of having her head shaved and scalped in order to perform the necessary skin grafting on her face and neck.  Mr. Reed required numerous skin grafts to all four limbs during his hospitalization at the NBC and required significant pain management for his injuries.  During their hospitalization at the NBC, Mr. Reed also had to endure treatment for the significant infections that resulted from his injury.

63. On January 30, 2020 – nearly two months after the Incident – the physicians at NBC discharged the Reeds from Middlemore and permitted them to make the long return trip to

---

[8] When admitted to Middlemore Hospital, Ms. Reed and Mr. Reed had initially been assessed as having suffered burns over 18% and 30%, respectively, of total body surface area.

the United States.

64. Given their serious injuries, which had required such extensive skin graft surgery, this lengthy voyage required that the Reeds be accompanied by a three-person medical team to assist them, administer extensive pain medication and monitor their condition. After a grueling flight lasting more than 13 hours from Auckland, New Zealand to San Francisco, California, during which they were unable to rest because of the pain, the Reeds then had to endure a layover before finally boarding their 5-hour connecting flight to Washington, D.C.'s Dulles International Airport, still accompanied by the medical team. Once they arrived in Washington, D.C. late on January 30, 2020 after nearly a full 24-hour day of travel, the Reeds were transferred by ambulance to the hospital.

65. Following their arduous return trip to the United States, the Reeds were initially admitted to the Burn Unit at Medstar Washington Hospital Center, Washington, D.C. for observation. They were discharged from Washington Hospital Center the following day and permitted to return home. However, they then needed to begin lengthy and painful physical, occupational and psychological therapy. Both Ms. Reed and Mr. Reed have also undergone psychological evaluation and counseling stemming from the Incident.

66. The Reeds continued out-patient therapy at Washington Hospital Center through mid-March 2020, at which time visits to the Center were suspended because of the COVID-19 pandemic. Nevertheless, the Reeds must continue their rehabilitation, which at a minimum for Ms. Reed will likely include one or more additional surgeries to address the permanent injuries to her left hand. Mr. Reed will require surgery on his left thumb, which he cannot bend. Both of the Reeds will require laser surgery on multiple skin graft sites.

**The Aftermath of the Incident**

67. As evidenced from the embedded photographs, the Reeds have suffered permanent, painful and disfiguring injuries as a result of the Incident.

Figure 2 below shows the extensive burns and scarring to Mr. Reed's legs.  Figures 3-7 show the burns, scarring and skin grafts to Ms. Reed's face, nose, neck and hands.



Figure 2 -- Photo of injuries to Paul Reed's Legs showing extensive scarring -- Jan. 7, 2020



Figure 3 -- Right side profile of Ivy Reed showing
extensive scarring to face and neck -- Jan. 18, 2020



Figure 4 -- Photo of Injuries to Ivy Reed's neck
and face -- Jan. 18, 2020



Figure 5 -- Photo of Ivy Reed, showing skin grafting and scarring to nose, face and neck -- Jan. 18, 2020



Figure 6 -- Photo showing extensive scarring of Ivy Reed's right hand



Figure 7 -- Photo of Ivy Reed's left hand, showing extensive scarring and severe damage to ring finger, which required cutting off her wedding band and engagement ring.

68. The life plan of the Reeds has been upended as a result of the Incident and the severe, permanent, and ongoing injuries that they suffered and continue to suffer.  For at least several years, the Reeds will continue to need occupational and physical rehabilitation therapy, which has been delayed since March 2020 because of the COVID-19 pandemic. In addition to the delays in treatment caused by the COVID-19 pandemic, the Reeds have concerns that they may be more likely to contract COVID-19 as a result of exposure to pathogens through attending necessary medical appointments, and that their injuries from the Incident may be an underlying condition that could exacerbate the effects of COVID-19

on them, should they contract the disease.

69. The Reeds' necessary medical treatments have included but not been limited to skin graft surgery, surgery for the injuries to her neck and face for Ms. Reed, surgeries for his arms and legs for Mr. Reed, substantial pain management, and rehabilitative therapy.

70. As of the date of this Complaint, Ivy Reed has still not been able to return to work; she has not been medically cleared to work and remains on leave. She suffers from extremely limited use of her dominant left hand. As a social worker, she needs use of her writing hand to keep notes during patient evaluations. As a result of the injury to her left hand during the Incident, although she can write, doing so causes her great pain and leaves her exhausted. Her ability to write is limited in duration by pain and if it requires speed, her handwriting becomes illegible. Further, she encounters great difficulty in typing because of the contracture of the two fingers on her left hand. In addition, her hand has become hypersensitive to changes in temperature, rendering even simple tasks like cooking and doing laundry extremely painful. Also, she has experienced emotional trauma from flashbacks to the Incident. Further, Ms. Reed's physicians are still attempting to determine the cause of the elevated readings in her liver function tests, a condition that was first detected when Ms. Reed was hospitalized in New Zealand after the Incident.

71. Mr. Reed suffers from continued pain in his severely burned legs, which makes it difficult to stand for protracted periods. He also has restricted use of his left hand. Mr. Reed cannot bend his left thumb nor make a fist without pain. He has terrible scars on his right arm and hardly any feeling in the top of his hands. Although Mr. Reed has been medically cleared to return to work and had begun working again in July 2020, his continuing injuries

- 24 -

make it difficult to withstand the substantial time he must endure on his feet or at a computer as required by his job.  He endures nearly constant numbness in the front of both legs where skin has been grafted.  Mr. Reed's knees ache and are stiff and painful every morning from the grafts that go over the knee.  Mr. Reed also suffers from lingering fatigue and exhaustion, so that it is difficult or impossible to keep his former work schedule, even though he is doing less physical work than before.  Whereas he had regularly worked previously 45-50 hours per week, it is difficult for him now to recover from a 3-4-day work week.  Further, Mr. Reed has difficulty in thermoregulating his body as a result of the burn injuries.  He also has permanent scars on his forehead and neck caused by the burning rock and ash from the volcano.

**The WorkSafe Investigation**

72. WorkSafe is New Zealand's primary workplace health and safety regulator.   On November 30, 2020, WorkSafe filed criminal charges in court against various entities and individuals in relation to the White Island eruption.  White Island Tours has confirmed that it is among the 13 parties charged.  According to WorkSafe, it "is tasked with investigating workplace incidents to determine whether those with health and safety responsibilities met them."  Regarding the Incident, WorkSafe concluded that: "[t]his was an unexpected event, but that does not mean it was unforeseeable and there is a duty on operators to protect those in their care."[9]

---

[9]    https://worksafe.govt.nz/about-us/news-and-media/13-parties-charged-by-worksafe-new-zealand-over-whakaariwhite-island-tragedy/

## **FIRST CAUSE OF ACTION:  NEGLIGENCE/FAILURE TO WARN**

73. Plaintiffs Ivy and Paul Reed re-allege and fully incorporate by reference the allegations common to all counts contained in paragraphs 1-72, *supra*.

74. Federal maritime law applies to actions arising from alleged torts committed aboard a vessel sailing in navigable waters.

75. As the owner of a vessel in navigable waters, RCCL and its apparent agents owed to all who are on board the Ship, including the Reeds, the duty of exercising reasonable care under the circumstances in all matters related to the Incident.  This duty extends to torts occurring at offshore locations, shore excursions, and at ports-of-call during the course of a cruise.

76. The duty owed to passengers by RCCL extends to advising about potential dangers beyond the point of debarkation, specifically including excursions beyond the point of debarkation in places where passengers are invited or reasonably expected to visit, such as the shore excursion to White Island.  RCCL's duty to warn applies to dangers on shore that are not open and obvious, of which the cruise line had actual or constructive knowledge, and that exist in places where passengers are invited or reasonably expected to visit.  A passenger is reasonably expected to visit a place specifically advertised and promoted, as was White Island, as a recommended shore excursion on a cruise line's website, in its cruise promotional materials, and on board the Ship.  In this case, RCCL made no disclosure or warning to the Reeds about potential risks associated with the White Island shore excursion.

77. At all times material hereto, RCCL knew or should have known that the White Island shore excursion was unreasonably hazardous and/or that the excursion was not

competently operated by properly trained and/or supervised persons, for reasons that include, but are not limited to, (1) the excursion took place on a volcano that was active prior to the incident, including an eruption in 2016 which impacted the hiking trails used during shore excursions; (2) New Zealand's GeoNet had issued a series of Volcanic Alert Bulletins raising the Volcanic Alert Level to Level 2 beginning on November 18, 2019, and reiterated in Volcanic Alert Bulletins issued on November 25, 2019 and December 3, 2019, each progressively noting changes as the risk increased; (3) RCCL had an office in New Zealand that knew or should have known of the elevated Volcanic Alert Level and history of eruptions of the volcano at White Island.

78. RCCL had actual and constructive knowledge of the dangers associated with excursions to active volcanoes.  After the May 3, 2018 eruption of Mt. Kilauea began on the island of Hawaii, RCCL canceled stops on the island of Hawaii and further excursions to the volcano.

79. RCCL owed a duty of care to the Reeds with respect to the shore excursion to White Island, a location which RCCL invited the Reeds and other passengers on the Ship to visit. RCCL itself promoted to the Reeds and all passengers on board the ship as an adventure of a lifetime, handled all booking and payments, rescheduled the departure time due to RCCL's time considerations, and arranged transportation for passengers from the time they disembarked the Ship in Tauranga to Whakatane to the location where they boarded the boat to White Island.

80. RCCL knew or should have known that the Volcanic Alert Level for an eruption on White Island had been raised from Level 1 -- "minor volcanic unrest" -- to Level 2 --

"heightened volcanic unrest" and that this entailed the "potential for eruption hazards." RCCL maintained at the time of the Incident an office in New Zealand to handle matters related to operational activities of its ships while in New Zealand waters.  Thus, RCCL would have had actual and constructive notice of information that would impact the stay of the Ship and shore excursions in New Zealand waters, specifically the fact that GeoNet had raised the Volcanic Alert Level for White Island from Level 1 to Level 2 indicating that "unrest hazards on the volcano…could include eruptions of steam, gas, mud and rocks.  These eruptions can occur with little or no warning."   GeoNet issued Volcanic Alert Bulletins regarding the Level 2 Alert on November 18, 2019, November 25, 2019, and December 3, 2019; had widely disseminated this information in the tourist industry in New Zealand; and had specifically conveyed this information to RCCL's excursion operator.   Nevertheless, RCCL never provided any warning to the Reeds.

81. Further, RCCL had actual knowledge of the GeoNet elevation of the Volcanic Alert Level on White Island to Level 2 from Level 1.   Prior to the Incident, RCCL personnel changed at least one Ship passenger's booking of the White Island tour due to the Level 2 Volcanic Alert, and its personnel specifically acknowledged the elevated Volcanic Alert Level to that passenger.  Despite this actual knowledge, RCCL never provided any warning to the Reeds.

82. Similarly, White Island Tours, RCCL's apparent agent and the operator of the tour who took the Reeds and the other passengers to White Island, provided no notice of the increased Volcanic Alert Level 2 to the Reeds, provided no warning of potential hazards of the shore excursion, and provided no safety warning or demonstration to the Reeds once

on board the Te Puia Whakaari, the vessel that took the Reeds and other visitors from Whakatane to White Island for the shore excursion.  RCCL's apparent agent, White Island Tours, provided no information to the Reeds of the designated shelter on White Island.

83. WorkSafe, New Zealand's primary workplace health and safety regulator, has filed criminal charges against thirteen parties, including White Island Tours.  WorkSafe concluded that the hazards were foreseeable, and that White Island Tours failed its duty to those on the excursion, including the Reeds

84. RCCL breached its duty to warn the Reeds of the risks and dangers associated with the White Island shore excursion in several ways, including but not limited to: (1) RCCL's failure to adequately monitor volcanic alert levels and/or volcanic activity; (2) RCCL's failure to notify the Reeds prior to the White Island shore excursion of the dangers and risks associated with a shore excursion to an active volcano; (3) RCCL's failure to notify the Reeds prior to the shore excursion of the fact that the GeoNet Volcanic Alert Level had been raised to Level 2 a few weeks prior to the shore excursion on November 18, 2019, and GeoNet had issued bulletins maintaining a "Level 2" alert on November 25, 2019 and December 3, 2019; (4) RCCL's changing of another passenger's excursion after the passenger raised the issue of the elevation of the Volcanic Alert Level with RCCL staff on board the Ship but not conveying that information to the Reeds; and/or (5) RCCL's decision to proceed with the excursion despite the elevated Volcanic Alert Levels.

85. The hazard indicated by the elevated Volcanic Alert Level was not an open and obvious risk about which persons like the Reeds visiting New Zealand from the United States, and who reasonably relied on their cruise operator to provide such information,

should have been aware, but was a circumstance of which RCCL had constructive and actual knowledge.

86. As a direct and proximate cause of RCCL's failure to provide the Reeds with any warning whatsoever about the risks of the shore excursion, including the 2016 eruption and the elevated Volcanic Threat Level on White Island as of the date of the Incident, the Reeds proceeded with the excursion to White Island without knowledge of those risks, with frightful consequences.  The Reeds have suffered ongoing mental anguish, loss of enjoyment of life, permanent disability, permanent disfigurement, traumatic recurring flashbacks of the Incident, other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiffs' injuries, are continuing to incur and will incur future medical expenses, loss of consortium, suffered physical handicap, lost earnings and lost earning capacity, both past and future, as a result of the eruption of the White Island volcano, which could have been avoided had RCCL warned the Reeds of the heightened Volcanic Alert Level and other dangers of the shore excursion.

87. Plaintiffs Ivy and Paul Reed ask for a verdict and damages in their favor on this count of Negligence/Negligent Failure to Warn.

## COUNT TWO:  NEGLIGENCE BASED UPON APPARENT AGENCY

88. Plaintiffs Ivy and Paul Reed re-allege and fully incorporate by reference the allegations common to all counts contained in paragraphs 1-72, *supra*.

89. As the owner of a vessel in navigable waters, RCCL and its apparent agents owed to all who are on board the Ship the duty of exercising reasonable care under the

circumstances of matters related to the Incident.  This duty extends to shore excursions such as the White Island excursion where the Incident occurred.

90. During the time in question in the Complaint, a relationship of apparent agency existed between RCCL as principal and White Island Tours as its agent.  RCCL is liable for the negligence of RCCL's apparent agent White Island Tours in proceeding with the shore excursion to White Island after the increase in the Volcanic Alert Level from Level 1 to Level 2.

91. To the knowledge of the Reeds, the White Island excursion was an RCCL activity. RCCL promoted the White Island excursion as its own activity.  RCCL never identified the tour operator when it offered the excursion to passengers as an option for the port stop at Tauranga.  RCCL booked the Reeds' reservation, took direct payment for the excursion, and presumably retained a substantial part of the fee that RCCL charged the Reeds.  RCCL discouraged its passengers from seeking another provider of shore excursions.  RCCL also handled and processed a change in the excursion reservation time directly with the Reeds. RCCL directly handled the bus transfer of the Reeds and other passengers from the Ship to Whakatane for the shore excursion.  The voucher for the excursion did not identify White Island Tours but did prominently display RCCL graphics and logos.

92. Up and until the Reeds' arrival at the Whakatane dock, RCCL presented the White Island excursion as its own.  RCCL never identified White Island Tours as the tour operator in any of the marketing or billing materials provided by RCCL to the Reeds regarding the White Island excursion.  The excursion voucher provided by RCCL to the Reeds did not identify White Island Tours as the agent providing the excursion but did prominently contain

RCCL graphics and logos.  Until such time as the Reeds arrived at the dock in Whakatane on the date of the Incident, the Reeds were not aware of the identity of the tour operator. When they arrived at Whakatane, the Reeds reasonably relied on White Island Tours as the apparent agent selected by the principal RCCL to conduct the excursion to White Island for RCCL.

93. White Island Tours, apparent agent of RCCL, had been specifically advised by GeoNet of the raising of the Volcanic Alert Level from Level 1 -- "minor volcanic unrest" -- to Level 2 -- "heightened volcanic unrest" and that without warning, "could include eruptions of steam, gas, mud and rocks."  White Island Tours also had actual knowledge of the 2016 eruption of the White Island volcano.

94. White Island Tours, RCCL's apparent agent, provided no information about the 2016 eruption or the recently elevated Volcanic Alert Level to the Reeds at any time prior to the Incident.  White Island Tours neither provided any warning of possible risks and hazards nor requested any waiver of liability.

95. Notwithstanding the elevated Volcanic Alert Level, White Island Tours nevertheless proceeded to take the Reeds and other passengers to White Island.

96. White Island Tours provided no safety briefing for the Reeds.  It provided no safety equipment other than a plastic hard hat and a device to assist in breathing sulfurous fumes, not equipment to assist breathing in the event of an eruption and release of poisonous gases.  It provided no information about the designated shelter point on the Island.  White Island Tours' vessel Phoenix had little if any first aid equipment aboard, and had neither personnel aboard trained in first aid in the event of an emergency, nor any rescue plan in

the event of an eruption.

97. WorkSafe, New Zealand's primary workplace health and safety regulator, has filed criminal charges against thirteen parties, including White Island Tours. WorkSafe concluded that the hazards were foreseeable, and that White Island Tours failed its duty to those on the excursion, including the Reeds

98. As a direct and proximate cause of the failure of RCCL's apparent agent, White Island Tours, to provide any warning whatsoever about the 2016 eruption or the elevated Volcanic Threat Level on White Island and its proceeding with the excursion despite the elevated Volcano Alert Level, the Reeds unknowingly proceeded with the excursion to White Island, with frightful consequences. The Reeds have suffered ongoing mental anguish, loss of enjoyment of life, permanent disability, permanent disfigurement, traumatic recurring flashbacks of the Incident and other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiffs' injuries, are continuing to incur and will incur future medical expenses, loss of consortium, suffered physical handicap, lost earnings and lost earning capacity, both past and future, as a result of the eruption of the White Island volcano, which could have been avoided had RCCL and its apparent agent properly warned the Reeds of the heightened Volcanic Alert Level. Those injuries were compounded by the lack of safety equipment and even basic first aid equipment and personnel on the White Island Tours boat.

99. Plaintiffs Ivy and Paul Reed ask for a verdict and damages in their favor on this count of Negligence Based on Apparent Agency.

## COUNT THREE:  NEGLIGENT MISREPRESENTATION

100.      Plaintiffs Ivy and Paul Reed re-allege and fully incorporate by reference the allegations common to all counts contained in paragraphs 1-72, *supra*.

101.      As the owner of a ship in navigable waters, RCCL owed to all who are on board the Ship the duty of exercising reasonable care under the circumstances of matters related to the Incident.  This duty extends to shore excursions such as the White Island excursion where the Incident occurred.  This duty applies to the representations that RCCL made to passengers, including the Reeds, about the White Island excursion, as well as RCCL's omissions of material fact.

102.      On May 28, 2019, the Reeds purchased tickets for several shore excursions during the cruise of the Ship, including an excursion at the Tauranga port described as a "Journey to sunny Whakatane for a scenic boat ride along the picturesque Bay of Plenty to White Island for an unforgettable guided tour of New Zealand's most active volcano."  RCCL promoted and marketed the visit to White Island on its website as the "adventure of a lifetime;" an "unforgettable" opportunity to see one of New Zealand's "epic" adventures.

103.      Although RCCL had, through its office in New Zealand, actual and/or constructive knowledge of the eruption of White Island in 2016, RCCL never qualified its representations by noting any risk of serious and disfiguring injuries from such an excursion. The RCCL website page for the White Island excursion, since taken down, similarly failed to provide any information about the risk of serious injury.

104.      After GeoNet raised the Volcanic Alert Level from Level 1 -- "minor volcanic unrest" -- to Level 2 -- "heightened volcanic unrest" and that without warning, "could include

eruptions of steam, gas, mud and rocks," RCCL did not advise passengers on the Ship who had purchased the White Island shore excursion of the elevated Volcanic Alert Level. RCCL continued to advertise the White Island shore excursion after GeoNet's original elevated Volcanic Alert Level warning bulletin was issued on November 18, 2019, after additional GeoNet "Level 2" bulletins dated November 25, 2019 and December 3, 2019, and after the Ship set sail from Sydney on December 4, 2019.

105.     The vouchers for the White Island excursion provided to Ivy Reed and Paul Reed similarly did not qualify the representation about the excursion or disclose possible hazards. The voucher contained no warning whatsoever about any potential hazard or risk of serious bodily injury.

106.     RCCL failed to disclose that there were serious and deadly risks and hazards associated with the shore excursion to an active volcano, failed to disclose the 2016 eruption, failed to disclose the elevated Volcanic Threat Level, and merely told passengers to wear walking shoes and advised them to consider their "physical fitness level and medical history" when determining whether the tour was appropriate for them, and failed to warn of the risk of death or severe injuries.

107.     RCCL promoted the White Island shore excursion – while simultaneously failing to disclose certain negative information including its serious and life-threatening potential risks and hazards – with the intent of inducing the Reeds and other passengers to purchase the White Island excursion.

108.     RCCL received a financial benefit from the sale of every White Island excursion purchased by its passengers through the website, including the Reeds.

109.     RCCL knew or should have known that its failure to include statements about the risks of severe injuries or death was a failure to state material facts regarding the risk of the White Island excursion.

110.     The Reeds purchased the White Island excursion from RCCL in reliance on the statements made by RCCL about the excursion, and without the benefit of the material facts and information omitted by RCCL from those statements regarding the elevated Volcano Alert Level, 2016 White Island eruption, or other potential risks.

111.     As a direct and proximate cause of the reliance upon the negligent misrepresentations by RCCL, the Reeds unknowingly proceeded with the excursion to White Island, with frightful consequences.   The Reeds have suffered ongoing mental anguish, loss of enjoyment of life, permanent disability, permanent disfigurement, traumatic recurring flashbacks of the Incident and other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiffs' injuries, are continuing to incur and will incur future medical expenses, loss of consortium, suffered physical handicap, lost earnings and lost earning capacity, both past and future, as a result of the eruption of the White Island volcano, which could have been avoided had RCCL but for RCCL's negligent misrepresentations and material omissions.

112.     Plaintiffs Ivy and Paul Reed ask for a verdict and damages in their favor on this count of Negligent Misrepresentation.

### COUNT FOUR: NEGLIGENT SELECTION OF TOUR OPERATOR

113.     Plaintiffs Ivy and Paul Reed re-allege and fully incorporate by reference the allegations common to all counts contained in paragraphs 1-72, *supra*.

114.     As the owner of a vessel in navigable waters, RCCL and its apparent agents owed to all who are on board the Ship the duty of exercising reasonable care under the circumstances of matters related to the Incident.  This duty extends to shore excursions such as the White Island excursion where the Incident occurred.

115.     RCCL owes a duty of care to its passengers after debarkation, which specifically includes excursions beyond the point of debarkation in places where passengers are invited or reasonably expected to visit and to which RCCL specifically invited the Reeds and other passengers on the Ship, including a duty to select its excursion operator with due care for its passengers and their safety.  Notwithstanding RCCL's representations about how it selected its excursion providers, RCCL failed to inquire as to the fitness of White Island Tours to conduct the deadly excursion to White Island.

116.     RCCL represents that it "thoroughly reviewed its tour operators," including each excursion's "guide" that "provides proper equipment and ensures the safety of gear used on excursions."  Had it done so, however, RCCL would have known or should have known that at no time before the boat reached White Island were the Reeds warned by White Island Tours, RCCL's selected provider of the excursion, about the elevated Volcanic Alert Level, 2016 eruption, or other risks associated with the shore excursion.  If RCCL had thoroughly reviewed White Island Tours, RCCL's selected excursion provider, RCCL would

have known or should have known that at no time did White Island Tours provide the Reeds any demonstration in use of safety equipment while on White Island, provide written safety information, present them with any written disclosure of the risks of the excursion or any other documentation about risks associated with visiting the volcano. Further, had RCCL diligently vetted its chosen excursion provider, as it represented it did, RCCL would have known that White Island Tours did not have either adequate first aid equipment or personnel trained in first aid on the Phoenix. In addition, if RCCL had diligently reviewed the qualifications of White Island Tours, its chosen tour provider for the volcano excursion, it would have known or should have known that White Island Tours had no rescue plan in the event of an emergency and did not advise the Reeds of the existence of any rescue plan.

117.    WorkSafe, New Zealand's primary workplace health and safety regulator, has filed criminal charges against thirteen parties, including White Island Tours. WorkSafe concluded that the hazards were foreseeable, and that White Island Tours failed its duty to those on the excursion, including the Reeds.

118.    As a proximate cause of White Island Tours' incompetence and unfitness to conduct the excursion to White Island and RCCL's failure to diligently vet White Island Tours' ability to provide a safe excursion environment, the Reeds proceeded with the excursion to White Island without knowledge of those risks, with frightful consequences and without knowledge that (a) White Island Tours was unfit to provide the excursion and (b) that RCCL, despite its own website representations, had failed to vet the fitness of White Island Tours to provide the excursion. The Reeds have suffered ongoing mental anguish, loss of enjoyment of life, permanent disability, permanent disfigurement, traumatic recurring

- 38 -

flashbacks of the Incident, other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiffs' injuries, are continuing to incur and will incur future medical expenses, loss of consortium, suffered physical handicap, lost earnings and lost earning capacity, both past and future, as a result of the eruption of the White Island volcano, which could have been avoided had RCCL properly vetted White Island Tours.

119.     Plaintiffs Ivy and Paul Reed ask for a verdict and damages in their favor on this count of Negligent Selection of Tour Operator.

### COUNT FIVE:  LOSS OF CONSORTIUM RESULTING FROM DEFENDANT'S NEGLIGENCE – IVY REED

120.     Plaintiff Ivy Reed re-alleges and fully incorporates by reference the allegations common to all counts contained in paragraphs 1-72, *supra.*

121.     As documented in Figures 3-7 and described elsewhere in this Complaint, plaintiff Ivy Reed suffers from permanent, extensive and disfiguring injuries incurred during the Incident.  These injuries arose out of RCCL's failure to meet its duty of care to her by (a) RCCL's failing warn of the hazards of volcanic eruption on White Island; (b) RCCL's apparent agent negligently failing to warn and then proceed with the White Island excursion, despite the warnings of volcanic authority GeoNet, (c) RCCL's negligent misrepresentations while promoting the White Island excursion by failing to disclose certain negative information including its serious and life-threatening potential risks and hazards; and (d) RCCL's negligent retention of White Island Tours to provide the excursion to the volcano.

122.     As a direct and proximate result of the negligence of the defendant RCCL as

recounted above, plaintiff Ivy Reed suffered, in the past and will in the future, continue to suffer the loss of spousal comfort, society, services, and consortium of her husband, Paul Reed.

123.     Plaintiff Ivy Reed asks for a verdict and damages in her favor on this count of Loss of Consortium.

### COUNT SIX:  LOSS OF CONSORTIUM RESULTING FROM DEFENDANT'S NEGLIGENCE – PAUL REED

124.     Plaintiff Paul Reed re-alleges and fully incorporates by reference the allegations common to all counts contained in paragraphs 1-72, *supra*.

125.     As documented in Figure 2 and described elsewhere in this Complaint, plaintiff Paul Reed suffers from permanent, extensive and disfiguring injuries incurred during the Incident.  These injuries arose out of RCCL's failure to meet its duty of care to him by (a) RCCL's failing warn of the hazards of volcanic eruption on White Island; (b) RCCL's apparent agent negligently failing to warn and then proceed with the White Island excursion, despite the warnings of volcanic authority GeoNet, (c) RCCL's negligent misrepresentations while promoting the White Island excursion by failing to disclose certain negative information including its serious and life-threatening potential risks and hazards; and (d) RCCL's negligent retention of White Island Tours to provide the excursion to the volcano.

126.     As a direct and proximate result of the negligence of the defendant RCCL as recounted above, plaintiff Paul Reed suffered, in the past and will in the future, continue to suffer the loss of spousal comfort, society, services, and consortium of his wife, Ivy Reed.

127.     Plaintiff Paul Reed asks for a verdict and damages in his favor on this count

of Loss of Consortium.

## PAIN AND SUFFERING DAMAGES

128.    Plaintiffs Ivy and Paul Reed re-allege and fully incorporate by reference the allegations common to all counts contained in paragraphs 1-72, *supra*.

129.    As is readily evident from Figures 2-7 above, Ivy and Paul Reed have suffered permanent, painful and disfiguring injuries as a result of the Incident.   Having already endured numerous skin graft surgeries, substantial pain management, and rehabilitative therapy for their injured hands and legs, they must anticipate years more of such painful therapy and physical and mental rehabilitation.

130.    In addition to the scarring and disfiguring injuries, Ms. Reed suffers from extremely limited use of her dominant left hand.  She has suffered a contracture of the two fingers on her left hand.  In addition, her hand has become hypersensitive to changes in temperature, rendering even simple tasks like cooking and doing laundry extremely painful. Also, she has experienced emotional trauma from flashbacks to the Incident.  Further, Ms. Reed's physicians are still attempting to determine the cause of the elevated readings in her liver function tests first detected when hospitalized after the Incident.  Ms. Reed's pain and suffering is ongoing and will continue into the future.

131.    In addition to the scarring and disfiguring injuries, Mr. Reed cannot bend his left thumb nor make a fist without pain.  He has terrible scars on his right arm and hardly any feeling in the top of his hands.  Although Mr. Reed has been medically cleared to return to work and had begun working again in July 2020, his continuing injuries make it difficult to withstand the substantial time he must endure on his feet or at a computer as required by

his job.  He endures nearly constant numbness in the front of both legs where skin has been grafted.  Mr. Reed's knees ache and do not bend from the grafts that go over the knee.  Mr. Reed also suffers from lingering fatigue and exhaustion, so that it is difficult or impossible to keep his former work schedule, even though he is doing less physical work than before. Whereas he had regularly worked previously 45-50 hours per week, it is difficult for him now to recover from a 3-4-day work week.  Further, Mr. Reed has difficulty in thermoregulating his body as a result of the burn injuries.  He also has permanent scars on his forehead and neck caused by the burning rock and ash from the volcano.

132.     In light of these substantial and permanently disfiguring injuries and other past, continuing, and future physical and psychological ailments resulting from the Incident, Plaintiffs Ivy and Paul Reed ask for a verdict that awards them past, present, and future pain and suffering damages, in addition to all other damages.

## **JURY DEMAND**

133.     Plaintiffs demand a trial by jury of this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs demand judgment for all damages recoverable under the law and demand trial by jury.

Dated this __4th__ day of December, 2020

Respectfully submitted,

**IVY REED and PAUL REED by and through:**

Stephen Díaz Gavin, Esq.
(Not admitted in Florida)
stephen.diaz.gavin@rimonlaw.com
Jill Penwarden, Esq.
(Not admitted in Florida)
jill.penwarden@rimonlaw.com
**RIMON, P.C.**
**Co-counsel for Plaintiffs**
1717 K Street, N.W., Suite 900
Washington, D.C.  20006
(202) 871-3772

-and-

**THE VACCARO LAW FIRM, P.A.**
**Co-Counsel for Plaintiffs**
8958 West State Road 84, Suite 328
Davie, FL 33324
Tel:  (954) 734-2320
Fax: (954) 337-2959
Email: charles@vaccarolawfirm.com
Service Email: service@vaccarolawfirm.com

By_____
  CHARLES L. VACCARO
  Florida Bar No. 604320